## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                )
UNITED STATES OF AMERICA        )
                                )
        v.                      )
                                )        Criminal No. 11-CR-10416-DJC
STEPHEN STUART,                 )
                                )
        Defendant.              )
                                )
_____)

### UNITED STATES' SENTENCING MEMORANDUM

The United States of America respectfully recommends that the Court sentence the defendant, Stephen Stuart, to a probationary term of 20 months, including two months of community confinement and eight months of home detention. The United States also recommends that the Court impose a fine of $2,000, which is the low end of the applicable guideline sentencing range ("GSR"). Not only are these recommendations consistent with the plea agreement in this matter, they are consistent with the goals of sentencing as applied here.

On October 24, 2013, Stuart pleaded guilty to the two counts of the Superseding Indictment in which he was named: one count of wire fraud, in violation of 18 U.S.C. § 1343, and one count of mail fraud, in violation of 18 U.S.C. § 1341. The charges against Stuart arose out of a substantial undercover operation by the Federal Bureau of Investigation (the "FBI"), in which an undercover FBI agent (the "UA") posed as a corrupt hedge fund manager willing to provide financing from his clients' funds to executives of publicly traded companies in exchange for a secret 50% kickback. Stuart, who at the time was a shareholder of, and consultant to, ComCam International, Inc. ("ComCam"), agreed to participate in the scheme with the UA.

Unlike some other defendants who were charged in this and related cases, such as his co-defendant, Albert Reda, Stuart was not an officer or director who owed a fiduciary duty to the company he represented.  Thus, a "Zone-B" Guideline sentence that includes community and home confinement, but no term of imprisonment, is appropriate.

## BACKGROUND

The crimes for which Stuart is to be sentenced resulted from an undercover operation launched by the Boston division of the FBI in 2010, which focused on preventing fraud in the microcap stock markets.  Microcap companies are small, publicly traded companies whose stock often trades at pennies per share.  The FBI was aware that the microcap markets—in part because they are loosely regulated—were rife with fraud, but it was also the case that such fraud was difficult to detect using more traditional law-enforcement techniques.  *See United States v. Sneed*, 34 F.3d 1570, 1578 (10th Cir. 1994) ("[s]ting operations, though necessarily deceptive, are an effective law enforcement tool to uncover securities fraud . . . gathering after-the-fact evidence of illegal manipulation of penny stocks would be an all but impossible task").  In light of these facts, the FBI set up an undercover operation in which the agency itself would be the intended victim, so as to avoid any harm to the investing public.  More specifically, the UA posed as a manager of a major New York-based investment fund ("Seafin") who was willing to violate his duties to his investors by investing money—up to millions of dollars—in undeserving microcap companies, in exchange for a fifty-percent kickback from the executives of those companies.

On June 29, 2011, Stuart met with the UA in Burlington, Massachusetts, accompanied by Donald Gilbreath, ComCam's Chairman of the Board and Chief Executive Officer.  At that

meeting, the UA presented the kickback scenario to Stuart and Gilbreath, informing them that he could use his discretionary power to invest a portion of his clients' monies in order to fund ComCam, but would only do so if ComCam sent him back 50% of the money as a kickback that Seafin would know nothing about.  (PSR ¶ 31.)  The kickback payments, the UA explained, would be disguised through the use of a sham consulting company that the UA controlled, and would be accompanied by phony invoices purporting to describe consulting services which would never actually occur.  (PSR ¶ 31.)  Stuart and Gilbreath agreed to enter into this arrangement with the UA at the same meeting, and, approximately a week later, ComCam received the initial installment of ostensible funding from the FBI, in the form of a wire transfer of $34,000.20.  (PSR ¶ 32.)  On the same day, ComCam sent the 50% kickback to the UA's sham consulting company.  (PSR ¶ 32.)

Following the delivery of the first tranche of funding, and ComCam kicking 50% of it back to the UA, Stuart engaged in a series of telephone calls with Edward Henderson, who was cooperating in the investigation and subsequently pleaded guilty in a separate case.  (PSR ¶ 33).  During those calls, Stuart told Henderson that going forward the UA should deal with Stuart, not Gilbreath, concerning funding and that Stuart was in charge of the deal.  (PSR ¶ 33).  These phone calls also revealed Stuart's understanding that the funding was illegitimate.  (PSR ¶ 33).

### APPLICATION OF THE SENTENCING GUIDELINES

The parties agree with the United States Probation Office's calculation of the Sentencing Guidelines in this case.  The Base Offense Level is 7, pursuant to USSG §2B1.1(a)(1), and 6 levels are added because the intended loss here—$ 34,000—was more than $30,000, but not more than $70,000.  USSG §2B1.1(b)(1)(D).  Adding a 2-level reduction for acceptance of

responsibility results in a Total Offense Level of 11.  USSG §3E1.1(a).

Because Stuart's Criminal History Category is I, his GSR falls within Zone B, meaning that a term of probation that includes community confinement and home confinement is authorized.  USSG §5B1.1(a)(2).

## GOVERNMENT'S SENTENCING RECOMMENDATION

Consistent with the application of the Sentencing Guidelines and the plea agreement in this case, the government respectfully recommends that a sentence of probation, including some community and home confinement, plus a $2000 fine (and the applicable forfeiture), is appropriate here.[1]

As the federal sentencing guidelines are now advisory, district courts should "follow a specifically delineated roadmap" when imposing sentences. *United States v. Dávila-González*, 595 F.3d 42, 46 (1st Cir. 2010).  Pursuant to this roadmap, the sentencing court should establish the GSR, determine whether any departures are warranted, and, finally, weigh the sentencing factors set out in 18 U.S.C. § 3553(a) along with any other considerations relevant to a particular case. *United States v. Madera-Ortiz*, 637 F.3d 26, 30 (1st Cir. 2011) (citing *United States v.*

---

[1] In addition to the fine, the only difference between the government's recommendation and Stuart's recommendation is twelve months of probation to follow the eight months of combined community confinement and home detention.  In support of his argument against any additional term of probation, Stuart in his sentencing memorandum describes and cites to discussions that occurred during plea negotiations.  The conclusion that he apparently wants the Court to draw is that because the government may have been willing to support a particular sentencing recommendation under certain conditions, which never materialized, the Court should consider that theoretical recommendation as if it were made now.  Even assuming that Stuart accurately captured the plea discussions between the parties, which he has not, asking the Court to consider plea negotiations at sentencing is entirely inappropriate.  Not only does the Court not have before it (nor should it have) a "record" of the plea negotiations in this case, the myriad reasons why a party might advance a particular position during such negotiations have nothing to do with this Court's task in fashioning a sentence consistent with the edicts of 18 U.S.C. § 3553(a).

*Pelletier*, 469 F.3d 194, 203 (1st Cir. 2006)). Applying the sentencing factors in this case supports the government's sentencing recommendation.

The crime of conviction is a grave one, and the serious nature of the charges is reflected in the significant sentences of imprisonment imposed on defendants convicted of participating in the same undercover operation and who did not cooperate with the government.[2] The circumstances surrounding Stuart's involvement in the funding scheme, however, differ. Unlike Shaheed and Jordan, and unlike Albert Reda, Stuart was not an officer or director of the public company he was representing, which status imposes fiduciary duties, other special responsibilities, and an accordingly severe 4-level increase in offense level under USSG §2B1.1(b)(19)(A). Also, unlike Prange and Stuart's other co-defendant, Kelly Black White, who each represented multiple companies that participated in the funding scheme, Stuart's criminal activity was limited to one company: ComCam.

At the same time, however, Stuart did <u>not</u> cooperate with the investigation, unlike Gilbreath, ComCam's Chairman and CEO.[3] Unlike Stuart, Gilbreath immediately accepted responsibility upon being approached by the FBI and agreed to cooperate proactively with the FBI's ongoing investigation. The substantial assistance he provided and his extraordinary

---

[2] For example, Muhammad "M.J." Shaheed, who pleaded guilty on the eve of trial without a plea agreement, received a sentence of 24 months of incarceration, *see United States v. Shaheed*, 12-CR-10014-DPW; James Prange and J.C. Jordan, both convicted after trial, received sentences of 30 months imprisonment*, see United States v. Prange et al.*, 11-CR-10415-NMG.

[3] Stuart's statement in his sentencing memorandum that he "was not provided an opportunity to cooperate before he was indicted" is misleading. After he was arrested, but prior to indictment, Stuart's attorney met with the government and discussed the evidence and a potential plea. During that time period, Stuart had ample opportunity to present himself for possible cooperation, but he did not. Moreover, during plea discussions that occurred after indictment, Stuart was directly offered the opportunity to cooperate and he refused.

acceptance of responsibility helped earn Gilbreath a probationary sentence.

Imposing some community confinement and home detention—beyond the standard conditions—as part of Stuart's probation is prudent.  Stuart's calls with Henderson after ComCam received the first tranche of funding show not only that Stuart knew the deal was illegitimate, but also that he—not Gilbreath—was "in charge" of that illegitimate deal for ComCam.  In other words, Stuart was not apprehensive about participating in the crime; he embraced it wholeheartedly.[4]  The Court should send a message to Stuart, and to anyone else who might be thinking of engaging in similar conduct, that such criminal acts and choices are intolerable.


## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court impose a 20-month term of probation, including two months of community confinement and eight months of home detention, plus a $2,000 fine.  The government also requests that the Court enter the applicable order of forfeiture.

---

[4] The suggestion in Stuart's sentencing memorandum that his actions were just a selfless attempt to keep a struggling company in business is simply not credible.  As a shareholder and funding consultant for the company, he clearly stood to gain financially from what appeared to him to be a multi-million-dollar infusion of cash into the company.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By:     */s/ Eric P. Christofferson*
ERIC P. CHRISTOFFERSON
Assistant U.S. Attorney

Dated: January 15, 2014

CERTIFICATE OF SERVICE

I hereby certify that this document file through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Eric P. Christofferson*
ERIC P. CHRISTOFFERSON

Dated: January 15, 2014